UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IVAN TEJADA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ZOOMINFO TECHNOLOGIES, INC., HENRY SCHUCK, and M. GRAHAM O'BRIEN,<br><br>Defendant. | NO.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>Demand for Jury Trial |

Plaintiff Ivan Tejada ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made by ZoomInfo Technologies Inc. ("ZoomInfo" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of ZoomInfo's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

COMPLAINT - 1

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired ZoomInfo securities between November 3, 2025 and May 11, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Defendants provided investors with material information concerning ZoomInfo's growth potential for the fiscal year 2026. Defendants' statements included, among other things, confidence in the Company's projected revenue outlook and anticipated growth of its legacy and emerging AI-driven products, core software business and sustained improvement in net revenue retention.

3. Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of ZoomInfo's slowing growth its legacy seat-based subscription platforms and weakening customer retention in its downmarket segment. Further, the Company minimized concerns that customers were moving towards consumption-based usage models and developing internal AI-driven go-to-market solutions. Such statements absent these material facts caused Plaintiff and other shareholders to purchase ZoomInfo's securities at artificially inflated prices.

4. The truth emerged after the market closed on May 11, 2026 when ZoomInfo announced its first quarter 2026 financial results, unveiling a sharp decline in growth outlook and accordingly lowered its 2026 full year financial guidance.

COMPLAINT - 2

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

5. Investors and analysts reacted immediately to ZoomInfo's revelation. The price of ZoomInfo's common stock declined dramatically from a closing market price of $6.04 per share on May 11, 2026, ZoomInfo's stock price fell to $4.06 per share on May 12, 2026, a decline of about 33%.

**JURISDICTION AND VENUE**

6. Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Zoominfo is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**THE PARTIES**

11. Plaintiff purchased ZoomInfo common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in ZoomInfo is attached hereto.

12. ZoomInfo Technologies Inc. is a Delaware corporation with its principal executive offices located at 330 W Columbia Way, Floor 8, Vancouver, WA 98660. During the Class Period,

COMPLAINT - 3

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "GTM."

13.    Defendant Henry Schuck ("Schuck") was, at all relevant times, the Chief Executive Officer and Chairman of the Board of Directors of ZoomInfo.

14.    Defendant M. Graham O'Brien ("O'Brien") was, at all relevant times, the Chief Financial Officer of ZoomInfo.

15.    Defendants Schuck and O'Brien are sometimes referred to herein as the "Individual Defendants." ZoomInfo together with the Individual Defendants are referred to herein as the "Defendants."

16.    The Individual Defendants, because of their position with the Company, possessed the power and authority to control the contents of ZoomInfo's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information available to him, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the actions of the Individual Defendants.

17.    ZoomInfo is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

18.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to ZoomInfo under respondeat superior and agency principles.

COMPLAINT - 4

## SUBSTANTIVE ALLEGATIONS

### Company Background

19.     ZoomInfo Technologies Inc., together with its subsidiaries, provides go-to-market intelligence and engagement platform for sales, marketing, operations, and recruiting professionals in the United States and internationally. The company's cloud-based platform provides workflow tools and information on organizations and professionals to help users identify customers and engage prospects.

### The Defendants Materially Misled Investors Concerning ZoomInfo's Profitability for Fiscal Year 2026

*November 3, 2025*

20.     On November 3, 2025, Defendants published positive third quarter financial results, particularly in its Operations business. The press release also announced that ZoomInfo was raising its full year 2025 revenue guidance, stating, in relevant part:

**Third Quarter 2025 Financial Highlights:**
- GAAP Revenue of $318.0 million, an increase of 5% year-over-year.
- GAAP Operating income of $67.5 million and Adjusted operating income of $117.7 million.
- GAAP Operating income margin of 21% and Adjusted operating income margin of 37%.
- GAAP Cash flow from operations of $93.8 million and Unlevered free cash flow of $95.3 million.

\*       \*       \*

**Business Outlook:**

Based on information available as of November 3, 2025, ZoomInfo is providing guidance for the fourth quarter and full year 2025 as follows:

|  | Q4 2025 | Prior FY 2025 | FY 2025 |
|---|---|---|---|
| GAAP Revenue | $307 - $310M | $1.215 - $1.225B | $1.237-$1.24B |

21.     As part of the press release, Defendant Schuck, CEO of ZoomInfo, touted the Company's revenue growth and healthy customer base, stating, in relevant part:

COMPLAINT - 5

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

We delivered strong Q3 results with record revenue, accelerating Upmarket momentum, and improving net revenue retention, validating our strategic focus and the value we deliver to customers. We're building the future of go-to-market – connecting intelligence, automation, and execution in one system for go-to-market teams and the AI agents serving them.

22.　　During the accompanying earnings call, Defendant Schuck emphasized the growth with larger enterprise customers and success of growing AI opportunity and its go-to-market platform, stating, in pertinent part:

During the quarter, we accelerated upmarket growth, improved net revenue retention for the fifth straight quarter, delivered another quarter of strong profitability and are again raising our financial guidance for the year. *We are aggressively expanding the product portfolio with innovative go-to-market AI and workflow products as we continue our shift upmarket. I believe we are building and delivering the best solutions that we've ever put in front of customers, which is driving stronger daily engagement from a diverse set of go-to-market personas.*

Our operations suite again grew more than 20% year-over-year as our proprietary data asset continues to prove mission-critical to any AI-driven initiative that touches go-to-market. This is our fastest-growing product, and it's accelerating as it gets bigger. *And with the launch of Copilot last year, its expansion into GTM Workspace this quarter and the evolution of our GTM Studio platform, we've begun to play offense again. Through the innovation we are driving, I believe it is only a matter of time before ZoomInfo will be synonymous with AI and go-to-market.*

*We believe that our unique and proprietary data assets put us in the winners column as AI proliferates across go-to-market teams.*

＊　　＊　　＊

We are increasingly confident in the trajectory of the business, which gives us even more conviction that our ongoing share repurchases will drive substantial shareholder value, and we will continue to put the majority of the cash we generate into repurchasing ZoomInfo shares for as long as that is the best and highest return use of our free cash flow. *AI is giving us an opportunity to capitalize on our proprietary data assets.*

(Emphasis added).

23.　　On the same call, Defendant O'Brien touted ZoomInfo's improvement in customer retention, enterprise growth and AI product adoption, stating, in pertinent part:

COMPLAINT - 6

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

*Net revenue retention improved to 90% in the quarter, up 5 percentage points in the year and the highest level of NRR we have seen since Q2 2023. In-period net revenue retention for upmarket customers is again over 100% as we further entrench ZoomInfo as a mission-critical piece of the way scaled businesses go to market.* We have always operated efficiently with disciplined investments driving high levels of profitability, and I am pleased to report a 37% adjusted operating income margin in the quarter, delivering year-over-year margin improvement, which, combined with our revenue growth, returned us to a Rule of 40 company for the first time in 6 quarters.

*       *       *

Shifting to guidance. For Q4, we expect GAAP revenue in the range of $307 million to $310 million, adjusted operating income in the range of $117 million to $120 million and non-GAAP net income in the range of $0.27 to $0.29 per share. *We are again raising guidance for the full year. And for 2025, we now expect GAAP revenue in the range of $1.237 billion to $1.240 billion, representing positive 2% annual revenue growth for the year at the midpoint of guidance and adjusted operating income in the range of $440 million to $443 million, representing a 36% margin at the midpoint of guidance.* We expect non-GAAP net income in the range of $1.04 to $1.06 per share based on 341 million weighted average diluted shares outstanding, and we expect unlevered free cash flow in the range of $424 million to $444 million.

(Emphasis added).

24.     During the question-and-answer segment of the earnings call, Defendants addressed multiple questions surrounding ZoomInfo's upmarket strategy and AI products in the following pertinent exchanges:

<Q: Mark Ronald Murphy – JPMorgan Chase & Co. – Managing Director & Head of U.S.> Enterprise Software Research> The magnitude of revenue upside is just noticeably larger for Q3 than it has been in the recent past. I think we're seeing the same on RPO. I'm wondering if you can drill down into what you think might have fueled that extra strength there in the quarter.

<A: Michael Graham O'Brien> *Look, by every metric, Q3 was a really strong quarter. We executed well across the business. I'd say that the products that we're delivering are delivering better renewal outcomes. That mid-to-high single-digit uplift on initial renewal from Copilot is certainly above or above our internal expectation and that's contributing to revenue upside in the quarter.* We talked about the largest TCV deal in history that we closed early in Q3. That contributed to revenue upside.

COMPLAINT - 7

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

<Q: Sitikantha Panigrahi – Mizuho Securities – Managing Director> Graham, could you talk about upmarket retention? How has that been trending? And especially when you're seeing this -- the NRR growth, how much of that driven by seat count versus cross-selling of your different other modules?

<A: Michael Graham O'Brien> *The upmarket net retention was again above 100% in period in Q3. So we're definitely getting improving retention in that upmarket business as the mix becomes a greater part of the business. So we kind of get a compounding effect. It's coming from a lot of different places. We started building products a couple of years ago that were aimed at optimizing retention outcomes, and we're starting to benefit from that as these customers renew at much higher rates. We have upsell opportunity with Copilot now with GTM Workspace. We have upsell opportunity with go-to-market studio.*

<Q: Raimo Lenschow – Barclays Bank PLC – MD & Analyst> Can you talk a little bit about like it does sound like the world is getting out better there. Can you talk a little bit about more nuance in terms of geographies, verticals, et cetera, where you see like things getting really better versus kind of stable or still weak?

<A: Henry Schuck> *I think when we think about what's happening in the world with AI, and the AI transformations that are happening at companies across our customer base, we're getting more and more confident that those transformations can't be successful without a valid data foundation, which we think of as context, context for the AI that's going to be deployed. And so we feel really good about the fact that as those transformations continue here, that we're going to be a necessary component to any go-to-market AI transformation across our customer base and across the universe of prospects that we sell to.*

So we feel really good about that*. I think we saw improvement in downmarket retention sequentially as well, and we feel good about the new products driving better retention. And so I think there's just a lot in the positive column that gives us a lot of confidence in the business going forward.*

<Q: Koji Ikeda – BofA Securities – Vice President> I wanted to ask about the private unified data and AI company mentioned in the prepared remarks, a nice win there and clearly shows that they couldn't do it themselves. And so maybe can you talk a little bit about how that sales process went? And was it a bunch of back and forth with many proof of concepts? Or was it a pretty typically easy and smooth sale for you guys with this company?

<A: Henry Schuck> Yes. This was a customer who's actually been a customer of ZoomInfo for a number of years, and we've continued to grow that account through Merit across the organization. And as we continue -- as that company continues to move their business upmarket to target new personas and to bring on new salespeople, we're well positioned as we've already cleared security, data privacy review. *We've built trust with our stakeholders there, we're uniquely positioned to*

COMPLAINT - 8

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

*continue to grow the account there, and we were and then executed against that. There's still a tremendous amount of opportunity within that account and across our enterprise clients.*

<Q: Clark Joseph Wright – D.A. Davidson & Co. – Senior Research Associate> The Operations suite continues to be a key growth driver. And Henry, you made the point that the proprietary data assets that ZoomInfo has enhances enterprise's AI initiatives. How are you investing in leveraging AI internally to maintain and improve this data advantage?

<A: Henry Schuck> Yes. *We are really proud of how we're using AI internally at ZoomInfo. We are customer-zero on all of the AI solutions that we're releasing to our customers. We have thousands of salespeople on these products before we release them to our customers. They're leaned in. It's driving efficiency and their ability to engage with customers in insightful ways. It helps them create decks, and QBR plans, and account plans and writes back to the CRM for them. It flags risk in their account base. So we feel really good about the way that we're leveraging AI across ZoomInfo.*

*I would venture to guess that we are in the top decile of companies leveraging AI to drive efficiency and not just in our Go-To-Market organization.* Graham talked about ways that we're using it in our finance organization. *We're leveraging AI across our product organization. We've been able to drive efficiencies and lower headcount because we're leveraging AI to generate content for us to drive our product marketing motion.*

I think when we show other customers, our peer groups or our clients, the way that we use AI internally, they all walk away incredibly impressed by the way that we're leveraging it and wanting best practices, tear sheets that they can take back to their own organization. *We're going to continue to invest in AI to drive meaningful efficiency in our business.*

(Emphasis added).

*November 18, 2025*

25.     On November 18, 2025, Defendants presented at the Wells Fargo 9th Annual TMT Summit. Defendant O'Brien discussed the Company's continued Upmarket momentum and future growth opportunities driven by demand for its AI-driven go-to-market tools, stating:

<Q: Ryan Patrick MacWilliams – Wells Fargo Securities, LLC – Equity Analyst> Yes, definitely a more solid quarter than investors were anticipating. We love to kind of unpack some of the components behind that. So -- maybe starting on like the upmarket momentum.

COMPLAINT - 9

<A: Michael Graham O'Brien> Our market business is growing. *Like I said earlier, that's actually much more profitable than our downmarket business, so the kind of upside that we got top line in Q3, you could think of coming from improvements in that market net retention, where in period, our upmarket business, our customers had retention activity that was at 100% again for the second quarter in a row.*

Our operations business, which is almost exclusively upmarket, Think of this as our data foundation it's still growing 20% year-over-year. It's now more than 15% of our total business. *This is a product that is obviously, in AI beneficiary, as businesses of all sizes look to kind of start to marry their first-party data with our best-in-class B2B third-party data, so they can deliver effective GTM outcomes using AI.*

<Q: Ryan Patrick MacWilliams – Wells Fargo Securities, LLC – Equity Analyst> Actually, I want to double-click on that operations suite. So very strong growth in the quarter. For investors maybe who are new to the story, can you just kind of overview that product and how that makes sense in the generative AI world?

<A: Michael Graham O'Brien> Yes. *So operations is effectively our data suite for our core data asset, our proprietary data. So what we've -- basically, customers purchase that on a subscription basis. It's not a seat-based model. Think of it as like a data access subscription where they get access to a geo set of data or all 100 million companies that are in that data center, all 500 million business professionals.* We also layer signals and intent on top of that data asset. And then customers purchased it for a 1- or 2- or 3-year subscription. We enrich that data for them. We route it. We go on with them and we actually help them marry it with their first-party data to create this kind of live, always-on kind of data asset that then they can build application or agents on top of to have the context to go deliver those GTM outcomes that they're seeking to.

<Q: Ryan Patrick MacWilliams – Wells Fargo Securities, LLC – Equity Analyst> And it seems like, especially for customers and businesses that are newer to AI, go-to-market enrichment or kind of operations suite seems like the first step for them. So what's like the customer reaction been so far? And then has that kind of like the switched on for them like, okay, now we need to do more here?

<A: Michael Graham O'Brien> *Yes. I think the demand for AI for GTM is evident up and down our customer stack. Now there's like sophistication curves of whether it's how sophisticated are they from an AI and kind of AI usage on a day-to-day basis, how sophisticated are their data operations. And some big companies are less sophisticated. We have a lot of great opportunity to kind of show them the way as partners in that.*

COMPLAINT - 10

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

And then you actually have some more smaller even AI native companies that are just starting to build go-to-market after kind of an R&D phase. and we're kind of the clear frontrunner to go in and help them build AI for GTM as they start to go to market.

<Q: Ryan Patrick MacWilliams – Wells Fargo Securities, LLC – Equity Analyst> And just as you think about the components of your improving net retention, Copilot helps and improving retention rates on Copilot customers help, shift upmarket helps. So we've touched on some of the things and maybe a better macro environment for sales personnel hiring as well. But I guess like how would you disaggregate the pieces that have helped you there?

<A: Michael Graham O'Brien> Yes. I think the -- getting further away from the downsell pressure that we went through in 2022 and 2023 from -- mostly in our software vertical, a lot of that was seat compression. ***Operations is a big reason -- or a big contributor to our retention improvement. The customers that buy our operations suite have very high operations retention. They tend to buy once and then buy a lot more, whether that's more data or more services around that data, getting -- shifting more and more customers off of legacy Sales OS on to Copilot, we talked about earlier, like there's a better -- there's a renewal tailwind from doing that.***

<Q: Ryan Patrick MacWilliams – Wells Fargo Securities, LLC – Equity Analyst> And just on like what you've done internally with AI, like we're asking everybody today, like is there anything that you have one of the best sales forces I've ever seen…Just maybe on your own sales side, any AI efficiencies that you've seen and then maybe for the broader business as well.

<A: Michael Graham O'Brien> Yes. Look, I think we are our first and best customer of Copilot of GTM Workspace, go-to-market studio. I think we've been able to kind of rightsize our downmarket investment while reallocating some of that upmarket. A lot of that has come by leveraging our own products. ***And then even outside of sales and marketing, whether it's what you would expect kind of in R&D world in finance, there's been a lot of specific kind of AI use cases that we've built from a revenue accounting risk perspective. We use Copilot to do collections and accounts receivables, like a really valuable use case. So we've been leveraging our own products across our teams at ZoomInfo.***

<Q: Ryan Patrick MacWilliams – Wells Fargo Securities, LLC – Equity Analyst> [y]our conversations post the quarter with investors, what are those -- like they touched on anything that was interesting or you haven't thought of before? Or is there

COMPLAINT - 11

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

an area of focus that it seems like a pain point or just like investors are -- you're getting more questions than not now?

<A: Michael Graham O'Brien> Yes. I think conversations after we released earnings on the call were really positive. I think folks were pleasantly surprised by the upmarket acceleration. I think that was generally above and beyond expectations. It was good to see some improvement in down market. *A lot of what our investors are kind of digging in on is like GTM Workspace, what the next evolution of Copilot looks like, the excitement around operations, like that's still growing 20% and it's accelerating and it's 15% of the business, what could the future of that business look like in 2 to 5 years. So it's generally positive exciting conversations.*

(Emphasis added).

*December 3, 2025*

26.     On December 3, 2025, Defendants presented at the UBS Global Technology and AI Conference and reiterated ZoomInfo's transition into a broader AI-powered go-to-market platform, stating, in relevant part:

<Q: Taylor Anne McGinnis – UBS Investment Bank – Equity Research Analyst> So maybe you could just talk through the current demand trends that you're seeing and also how ZoomInfo is strategically evolving its business and strengthening for future growth opportunities?

<A: Henry Schuck> *And then the next thing we said was we see a really big opportunity with AI in go-to-market, and we were going to go aggressively after that opportunity.*

In May of '24, we released our first product there, our Copilot product. And so we've just started coming around on sort of a full year of renewal on that Copilot product. *What we're seeing is customers who use Copilot and leverage the AI functionalities there, renew and retain at mid- to high single digits better than our legacy sales product. So as customers are engaging with our new products, net retention rates are higher. We had rebuilt over that period of time, our product and engineering organizations.*

<Q: Taylor Anne McGinnis – UBS Investment Bank – Equity Research Analyst> And the other two big products, that ZoomInfo has announced more recently are GTM Studio and GTM Workspace. I recognize these are still very early stage, but maybe you could just give some color on what initial customer feedback has been and any early signs of adoption.

COMPLAINT - 12

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

<A: Henry Schuck> *So look, I think that in the future, there is going to be a go-to-market AI platform. And when you look across -- you walk into a company, there's HR, there's engineering, there are people who build the product. And then on the other side, there are people who sell -- who sell the product -- and market and sell the product.*

\* \* \*

But to do work in the AI era, you can't just rely on first-party data. *And so we really believe that the big opportunity in front of us is a go-to-market AI platform where go-to-market practitioners, whether they be marketing or sales account managers or account executives do their work.*

In order to get that -- to deliver that, the first thing you need is context for the AI agent. You have to have first-party data from your systems of record married to third-party data that comes together in a really clean way and deliver the contextual engine that AI agents can be -- can build on top of. And so we've been very focused on building that. And then that sort of core layer is what powers Copilot, it's what powers GTM Studio. It's what powers GTM Workspace.

\* \* \*

Everything we're building Copilot, Workspace, Studio. All of those solutions are AI native because we weren't trapped in this. What you would find in just about every other $1 billion SaaS business we weren't burdened with. *And so all of the new solutions are AI first, the velocity with which we're releasing those products is incredibly fast, and we don't have to sort of like bend over backwards to build it around legacy architecture.*

<Q: Taylor Anne McGinnis – UBS Investment Bank – Equity Research Analyst> And let's go back to OperationsOS. That's been playing an important role for growth. It's consistently been growing 20% plus. So could you just talk about the demand trends that you see there? It sounds like there's potential AI tailwinds attached to that business. So what's the update?

<A: Henry Schuck> *The big opportunity we see in '26 is being able to use Studio as the -- use GTM Studio as the interface to sell operations to a much broader segment of our customers.*

\* \* \*

And what Studio gives us the ability to do is actually show up with a software interface that says like, here's your total addressable market. You plug it into Snowflake here, you plug it into CRM here, you can bring that data in, you can merge it, you can match it, you could use AI. *And so it opens up a much larger segment of the market for us to sell our fastest-growing product into.*

COMPLAINT - 13

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

(Emphasis added).

*December 9, 2025*

27.    On December 9, 2025, Defendants presented at the 53rd Annual Nasdaq Investor Conference noting that the Company believes AI is shifting customers from seat-based software to data consumption models, stating, in pertinent part:

<Q: Christopher Quintero – Morgan Stanley – Equity Analyst> Another really interesting product, I think Henry has cited that Go-To-Market Studio is potentially one of the biggest products that ZoomInfo has ever released. So what does it exactly do? What are the kind of key workflows, processes that it really enables for customers here?

<A: Michael Graham O'Brien> Yes. ***GTM Studio is our orchestration engine. It's going to be part of our Operations suite. So our Operations business is our -- essentially our DaaS or our data access subscription. It's not seat-based. It's our fastest-growing business. It's now over 15% of our total ACV. It's growing 20% plus year-over-year and accelerating. This is a place where we are truly an AI beneficiary.***

<Q: Christopher Quintero – Morgan Stanley – Equity Analyst> Shifting gears a little bit to competition and the advent of AI. Maybe first on like the risk side. There's a lot of concerns from investors around the need for fewer employees and maybe sales reps in your case.

<A: Michael Graham O'Brien> Yes, I don't think there's a maximum. I think that we have a lot of different options for positive outcomes across a spectrum of seat trends. ***Largely, when we -- in like kind of our customer base, we haven't seen this like, "Oh, seats are going way down quickly." Like we did see the compression in '21 and '22, but that wasn't AI related. So we've seen largely neutral trends, pockets of hiring. We talked about the -- some of the shift back into outbound SDR hiring. But we are still diversifying our pricing models because we think this is the right long-term thing to do.***

***Within our seat base, we have a lot -- or within our customer base, there is a massive opportunity of unused -- or I guess, unsold seats right now. So if we historically sold legacy SalesOS largely to a top-of-funnel SDR or BDR use case, there are account management and account executive teams that exist at our current upmarket customer base that we haven't historically sold to.*** And GTM Workspace and Copilot were built to sell to those. So even with no net hiring in our seat base, we have a huge seat penetration opportunity alone there.

COMPLAINT - 14

<Q: Christopher Quintero – Morgan Stanley – Equity Analyst> What do you think is most underappreciated from investors about the ZoomInfo story? Where should they really be digging into?

<A: Michael Graham O'Brien> Yes. ***I think the -- overall, I think the economic fundamentals of the business are still very strong. We talk a lot about the free cash flow per share growth there. I do think from kind of a product or growth perspective, it's the Operations business. Like this is a place where we are clearly an AI beneficiary.*** I still think we're very early in this story, and we've got a business that's more than 15% of our total ACV that is accelerating that 20% plus growth. It's not seat-based, and it's just like an incredibly healthy business that we're really about the future of.

(Emphasis added).

*February 9, 2026*

28.     On February 9, 2026, Defendants published their fourth quarter and full-year 2025 financial results. Notably, Defendants issued its fiscal 2026 revenue guidance "in the range of $1.247 billion to $1.267 billion, representing positive 1% annual growth for the year at the midpoint of guidance." As part of the press release, Defendant Schuck emphasized the Company's AI-powered go-to-market platform, stating, in pertinent part:

In 2025 we delivered record revenue, expanded profitability, and increased free cash flow, while building the all-in-one AI platform for go-to-market teams. In 2026, our focus is on bringing that platform to our customers at scale – putting our differentiated data, intelligence, workflow automations, and AI-powered insights directly into the hands of go-to-market teams and AI agents so they can more efficiently find, win, and grow customers.

29.     During the corresponding earnings call, Defendant Schuck attributed the strength of the quarter to its Operations segment and AI-driven products such as Copilot, GTM Studio and GTM Workspace, stating, in relevant part:

Success in our operations business continues to be driven by demand for actionable, high-quality data, a key foundation to power AI use cases, and operations again grew more than 20% year-over-year in the quarter.

*        *        *

COMPLAINT - 15

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

2025 was a year of fast-paced innovation as we rebuilt our product and engineering motions to be AI first and leverage AI and LLMs to improve our data quality and build out the broader ZoomInfo platform.

\*         \*         \*

*AI development tools have lowered the cost of building software, but they don't erode our advantage at the data layer. They accelerate what we can build on top of it. We are more than a horizontal software company, and AI has been an accelerant, expanding the use cases we power and the workflows where ZoomInfo shows up.*

\*         \*         \*

*Customers are using our data to power AI agents, build audiences programmatically and run end-to-end campaigns that didn't exist 2 years ago. Operations, our Data-as-a-Service platform grew more than 20% year-over-year as we invested in data quality alongside that growth, adding over 10 million contacts and expanding coverage across 6 European markets because our customers' AI agents and workflows are only as good as the data powering them.* That expanding surface area is why we built GTM Studio, an orchestration layer where revenue operations teams unify CRM data, warehouse data and ZoomInfo intelligence in one workspace to build audiences enrich with AI agents and activate directly into downstream systems.

\*         \*         \*

*We have not and will not optimize for any single quarter's results, but rather for the multi-decade opportunity we see in front of us. We are now ready to go on the offense with these new products commercially available in 2026.*

\*         \*         \*

We have been presented with a generational opportunity to create value. While we can't control market forces, we do control our execution and our capital allocation. Our strong free cash flow generation and efficient operating model enable us to uniquely take advantage of the prevailing negativity. Equipped with our best products and our best leadership team ever, in 2026, we will rev our distribution engine and bring the go-to-market AI platform to all go-to-market professionals. *We are confident in our path ahead and in our ability to sustainably deliver revenue growth and industry-leading profitability. We will continue to grow free cash flow per share while defining the future of go-to-market with solutions that help our customers win in increasingly competitive markets.*

(Emphasis added).

30.    During the question-and-answer segment, Defendants touted the Company's continued growth and highlighted its transition into a AI-driven consumption-based platform in the following exchanges:

<Q: Aleksandr J. Zukin – Wolfe Research, LLC – MD & Head of the Software Group> Henry, you talked about how you're seeing customers connect their AI

COMPLAINT - 16

solutions to the ZoomInfo platform. And I guess I'm just curious, how are you monetizing that connectivity, the broader engagement presumably that you're seeing as those things get kind of orchestrated and plugged in? And how much do you expect kind of that type of engagement or growth to be a tailwind over the next 12 months? And even maybe comment on kind of some -- how you're hearing the other horizontal app vendors approach this dynamic?

<A: Henry Schuck> Yes. I mean I think, first, if we were just a software vendor, we wouldn't have this opportunity in front of us. I think when I was on a call last week with a large financial services firm, and they're building their own internal app where their financial team can go get answers and insights on any questions about businesses that they're prospecting into or wanting to learn from. And the first thing they asked us was, can we use your MCP server to plug into that? And they can. And so we're currently in the process of implementing our MCP server for them. That's a surface area we would never see before. We would enrich in CRM or we would -- or they would use our product in the traditional SaaS application.
*But now the surface area for where they want our data is expanding, and our technologies are plugging into those surface areas. Our guidance today looking forward through '26 doesn't take into consideration any tailwind from those new products or the expanding surface area where we see our data plugging into.* That's a consumption-based model, very similar to our DaaS and operations business, where when our customers consume that data, they're charged a consumption fee.
<Q: Taylor Anne McGinnis – UBS Investment Bank – Equity Research Analyst> so Henry, when you think about 20% Copilot penetration and a lot of the good demand that you're seeing around the data side of the business. Just curious if there's any initiatives in 2026 to unlock the growth potential in those areas further.

<A: Henry Schuck> Yes. I think first, one thing that I would add to Graham's commentary there is that there is more and more business from Copilot now in the customer base and in our ACV number, and we continue to see higher net retention rates from those customers who came on to Copilot versus our legacy non-AI solutions. *So we think that will continue to be a tailwind for us. We are aggressively moving our customer base on to Copilot and GTM Workspace and getting them access to our new AI tools. Those we believe will continue to be positive tailwinds to our business as well.*

<Q: Tyler Maverick Radke – Citigroup Inc. – VP & Senior Analyst> I wanted to just get your sense on how you expect this consumption pricing model to evolve? Like what are your aspirations for where this could be as a percentage of the business? And how do you think about this in terms of an accelerant to the overall growth profile?

<A: Henry Schuck> *I think you see the beginnings of that with our operations business, which is growing over 20% year-over-year, but it's happening in a much less programmatic way than what -- than the products that we're releasing today will provide for.* And so a customer in our operations business may plug in our APIs

COMPLAINT - 17

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

for enrichment in a CRM or they may take a data file that they integrate with Snowflake, and that's a much more manual business motion for us than our new products, which plug in seamlessly into Quad or OpenAI and allow them to take advantage in a much easier way of our data and our insights. ***And so we think consumption trends should follow very much what you see in operations.***

<Q: Surinder Singh Thind – Jefferies LLC – Equity Analyst> Henry, can you maybe talk about just the current Copilot penetration? And I think you had set a 3-year target when it was launched to kind of substantially have all of your customers on the new product. Can you talk about actually where we are in that cycle and what that really means for where ACV is today and where it will ultimately get to?

<A: Michael Graham O'Brien> ***We're at 20% penetration of the overall customer base. I'd say that we are on schedule, if not a little bit ahead of schedule relative to the migration plan that we rolled out back in Q2 of 2024. So we'll continue to migrate that core customer base to a Copilot experience over the next 2 years or so. And we're going to continue to be successful in getting uplift as we do that. A lot of our customers are on longer-term contracts. We have opportunities to move them off cycle, but a lot of them do end up waiting until they come up on a renewal event.*** And I'll point back to the migration is going well. Really pleased to see, though, that the renewal outcomes after actually being on Copilot for a year are better than what we saw from the legacy SalesOS. So that's where the kind of the real upside starts to kick in as we move more and more customers, both from a new business and an existing business perspective onto a Copilot experience.

(Emphasis added).

<u>*March 2, 2026*</u>

31.     On March 2, 2026, Defendants presented at the 47th Annual Raymond James Institutional Investor Conference reiterating that customers are prioritizing AI investments in the following exchanges:

<Q: Brian Christopher Peterson – Raymond James & Associates – Managing Director> And maybe just think about how ZoomInfo looks in kind of an AI world, I think it's a key debate in terms of like there's opportunities, but there's all risks. Like how could you frame that for us?

<A: Michael Graham O'Brien> ***Yes, I see a lot of opportunity. It depends what your view is of kind of applications and seats in the future. But I think across almost all scenarios, we have a really great opportunity. And I think about this as a spectrum of how ZoomInfo helps customers go-to-market in an AI world***. You start with the data foundation and we kind of touched on that with the operations business. Then you've got the orchestration layer with Go-To-Market Studio. You can think of that

COMPLAINT - 18

as like a control tower that sits on top of ZoomInfo data that brings in your first-party data from CRM, from Snowflake, from other data silos, marries all that first and third-party data together and then helps you design intelligent campaign design, helps you enrich data at scale and then effectively push that out.

<Q: Brian Christopher Peterson – Raymond James & Associates – Managing Director> And maybe just looking at AI from a budget perspective, are you finding that for some of your AI-enabled products that that's coming from an existing budget? Is that net new? Just curious how those conversations are going with customers.

<A: Michael Graham O'Brien> *It's a combination, but I would say that AI-specific budget is certainly kind of prioritized and is kind of better budget to go after.* Historically, we're usually coming from a CRO budget where sales are off-budget. Occasionally, it's a CIO or a data budget. *But we've had success kind of going and actually combining budget at some of our customers and sometimes under kind of an ELA motion where we get stakeholders and leaders across different parts of the business to come together and align on the long-term investment with ZoomInfo.*

<Q: Brian Christopher Peterson – Raymond James & Associates – Managing Director> Maybe opportunities to leverage AI. I know you're doing some of that today. But where do you think you could maybe expand that to drive further margin expansion going forward?

<A: Michael Graham O'Brien> Yes. *I mean, first and foremost, we're customer zero for our sales and marketing, AI products, right? So Copilot and Workspace, Go-To-Market Studio. We want to be best-in-class and to be the blueprint for our customers to show them how to leverage our own product set. And then outside of that, I think we've -- we're probably a little bit ahead of the curve in R&D when it comes to software development and productivity around that coding.* And then G&A, I think there's like some legal finance HR use cases, where we've been able to automate and eliminate manual work and do it in a way that actually reduces risk.

<Q: Unknown Attendee> So you mentioned you don't really see customers today deploying AI internally to build their own solutions. I'm curious. What do you see from AI-native start-up vendors? How do you think they compare to what you offer when you see them over ZoomInfo?

<A: Michael Graham O'Brien> Yes. *I think the AI development tools that are out there, stuff that we're using for our own developers like make application building easier. So I think if you are a -- or I guess, scenarios where AI native companies, like they might be building some of their own internal applications, whether that's for go-to-market use cases or not. There's always going to be some barrier about whether that makes sense for them to do it or just to go buy it from a trusted vendor.* But I do think it further enhances and highlights how valuable the context layer is

COMPLAINT - 19

because if you don't have the data and you don't have the context layer, whatever you're building on top of is not going to work.

(Emphasis added).

*March 3, 2026*

32.     On March 3, 2026, Defendants presented at the Morgan Stanley Technology, Media & Telecom Conference and reiterated that AI is expected to be a positive driver for the Company as it increases demand for its "proprietary data asset" in the following exchanges:

<Q: Christopher Quintero – Morgan Stanley – Equity Analyst> Let's just jump right into AI. It's the hot topic. Clearly, a lot of investors think that software is a displacement risk from large language models, AI start-ups. So -- from your perspective, can you elaborate what you view as the core competitive moat for ZoomInfo?

<A: Michael Graham O'Brien> Yes. I think AI is changing the way that people do their day-to-day work, and it's changing the way that software is built. ***Our competitive moat really stems from our proprietary data asset. You can think about that as largely coming from our contributory networks. We have 2 primary contributory networks. One is our customer contributory network where our customers will opt in to share business data with us. We're able to cleanse and enrich that data and refer to it back into our data asset.***

<Q: Christopher Quintero – Morgan Stanley – Equity Analyst> So it's the data you guys have built from both the customer angle that contributes, but then also the larger community that also contribute and some of the data enrichment you do with some of these upstream partnerships. On the opportunity side, like why do you all think ZoomInfo is well positioned to bring AI capabilities to your customers?

<A: Michael Graham O'Brien> Yes. ***I think that we see that we have the right to win to be the de facto go-to-market provider for essentially our -- anyone who sells to other businesses. And whether that's essentially on the application end with the Copilot Workspace for orchestration use cases with the Go-To-Market Studio, which we're broadly bringing to market right now in Q1 or essentially as the GTM context layer with our operations business.*** Our operations business is our fastest-growing business at scale. It's over $200 million of ARR. It's not a seat-based model, essentially a consumption and data access model. And we essentially have this full spectrum of solutions where we can show up and be mission-critical to however companies want to go to market.

<Q: Christopher Quintero – Morgan Stanley – Equity Analyst> How are you guys thinking about the adoption? What are you seeing right now in terms of adoption

COMPLAINT - 20

from customers from these products? And any expectations like where that could be a year or 2 years from now?

<A: Michael Graham O'Brien> *It's really going to be focused on what do the sequential consumption or engagement or usage trends look like.* So the history of Studio is similar to Workspace as we were building it with customers, a set of early access customers in Q2 and Q3 last year. We kind of rolled it out to a select group of customers in Q4 on paid proof of concepts, and now we're more broadly taking it to market in Q1. *So the way we're going to probably track this is looking at those consumption trends of those AI action credits as inventory data credits, cohort that and understand what those curves look like over time.*

<Q: Christopher Quintero – Morgan Stanley – Equity Analyst> NRR, that also improved meaningfully in 2025. Upmarket, that was above 100%. What drove that improvement? Was it the mix, the gross retention piece, the expansion? And ultimately, what are you embedding in terms of expansion rate for 2026 guidance?

<A: Michael Graham O'Brien> Yes. *Our overall net revenue retention was 90% in 2025. The upmarket business in period, the last few quarters was back at or above 100%, and that was an improvement. So we were improving within the segment. We have better gross retention, and we had -- did a good job with the expansion opportunities as well.*

*Downmarket, retention got a little bit better as we started going through renewal cycles with customers that have been qualified at a more rigorous level.* As we look forward, I don't -- I'm always hesitant to kind of call or rely on improvement downmarket. *But I think the next step in our growth phase upmarket will be how do we bridge from 100% net retention right now to closer to 105%.* I think that comes from stickier, deeper products and kind of the growth retention benefit that we get from that and then also bringing Go-To-Market Studio and Workspace and some of our consumption products to market here in 2026 and getting that expansion opportunity.

<Q: Christopher Quintero – Morgan Stanley – Equity Analyst> How do you think about the ability to kind of invest for growth, protecting those margins? Is this kind of the kind of temporary margin profile we should kind of think about in longer term, back to kind of greater margin expansion?

<A: Michael Graham O'Brien> Yes. *I think we're on a path to continue to improve margins and 2025 was kind of the first step on that path. Our guidance for 2026 is almost a point better than 2025. And if you look at it kind of function by function in the financial statements, we've talked about cost of service maybe coming up some and driving gross margin down.*

In R&D, we are already smaller than we were historically a few years ago. I'd characterize us as having kind of a smaller but more productive team. A lot of that's

COMPLAINT - 21

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

coming from reliance on AI coding tools and essentially more talent density. So I think R&D is effectively for fully loaded for the products that we are built or are building. There's no real incremental investment needed there.

\*          \*          \*

*And then in G&A, I think we've been pretty forward on the curve of adopting AI to automate or eliminate manual tasks. I think we've done a good job of that in finance, in HR, in legal, in IT, and I continue to see opportunity to do that in '26 and beyond.*

(Emphasis added).

33.     The above statements in Paragraphs 20 to 32 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth of its legacy and emerging AI-driven products, core software business and sustained improvement in net revenue retention. In truth, ZoomInfo's optimistic plan for continued growth was undermined by slowing seat-based demand, weakening upsells and customers revising decisions to purchase AI products and develop internal AI-driven go-to-market solutions, making ZoomInfo's 2026 full year revenue guidance increasingly unlikely to be met. Defendants misled investors by providing the public with materially flawed statements of confidence and growth projections which did not account for these variables.

## The Truth Emerges

### *May 11, 2026*

34.     On May 11, 2026, after the market closed, Defendants published their first quarter 2026 financial results. In pertinent part, the press release announced Defendants were reducing its revenue guidance, stating, in pertinent part:

**Business Outlook:**

Based on information available as of May 11, 2026, ZoomInfo is providing guidance for the second quarter and full year 2026 as follows:

| **Q2 2026** | **Prior FY 2026** | **FY 2026** |
| --- | --- | --- |

COMPLAINT - 22

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

GAAP Revenue          $300 - $303M      $1.247 - $1.267B      $1.185-$1.205B

35.     During the accompanying earnings call, Defendant Schuck highlighted ZoomInfo's disappointment with regression in growth and customer hesitation amid "AI and agentic confusion." Most notably, Defendant Schuck announced that the Company was realigning its downmarket business, laying off 20% of its workforce, and expecting to incur approximately $45-60 million in restructuring costs, stating, in pertinent part:

> While we exceeded our guidance in Q1, as macro conditions worsened at the end of the quarter, *we experienced a regression in our downmarket and upmarket growth trajectories. In the closing days of March and into April, we saw a trend of AI and agentic confusion in our customer conversations.* What can be built versus bought, what vendor or internal team delivers what and where the differentiation really lives. *This led to a pause in purchasing decisions and our software customers were particularly affected as many are facing a confusing purchasing landscape compounded by the threat of their own growth disruption, creating a circular headwind in our space.*
>
> *As a result, we are revising our full year guidance down in conjunction with significant cost reductions that we believe will position us with structurally higher operating margins and create a faster path back to durable growth. This was hard because of the impact on a large number of our teammates, many with long tenures here who did good work to get us to this point. Change is necessary and a positive decision for the future of ZoomInfo.*

(Emphasis added).

36.     On the same call, Defendant O'Brien noted that due to the weakened demand later in the quarter, ZoomInfo was cutting its full year 2026 revenue guidance, stating, in relevant part:

> As we moved through March, we saw more customer confusion in the marketplace around what AI can and cannot do and increased macroeconomic uncertainty.
>
> *With the improving trends we have seen in 2025 starting to moderate, it became clear that our growth progression was no longer on schedule and that now is the right moment to be proactive and accelerate the time line of our strategic initiatives.* We believe we can further rightsize the downmarket business, shift to a better suited pricing model for our customers while reducing the potential overhang from further seat compression as we consolidate global operations while largely

COMPLAINT - 23

protecting profitability in the process, despite the near-term revenue impact, we can return to healthier growth levels sooner than a status quo approach would deliver.

***As a result, we are now guiding to FY 2026 revenue in the range of $1.185 billion to $1.205 billion. This is a proactive improvement measure in a period of significant transition. While our initial guidance for the year did not embed upside from new product initiatives, it also did not anticipate the environment getting worse.*** Our updated guidance adds some incremental top line conservatism to account for a fluctuating macroeconomic environment as well as the potential for near-term headwinds as we execute against our strategic initiatives.

(Emphasis added).

37.    During the question-and-answer segment, Defendants discussed the lower revenue guidance noting the weak software demand and slowdown in AI expansion by customers in the following pertinent exchanges:

<Q: Mark Ronald Murphy – JPMorgan Chase & Co. – Managing Director & Head of U.S. Enterprise Software Research> So it's a very software-centric kind of situation, it sounds like. I'm curious as well just how much of the AI confusion you're seeing would you relate to the takeoff of Claude Code during the month of March, I think that's when you saw a bit of a shift. And that seemed to be the period of lift off for Claude Code. And just as a corollary, any thought on how long that period of AI confusion might last?

<A: Henry Schuck> Yes. ***I think the big shift here is even in our most sophisticated software clients, what we're seeing them shift away from is a seat license in ZoomInfo and shift to significantly more consumption of our data inside of Claude with our MCPs through our APIs. We have a number of examples of AI native companies who have shifted from seats but are spending meaningfully more with us through consumption of our data in their internal applications that they've built through our MCPs, through our APIs, through bulk credit consumption.***

And so we have a lot of confidence that there's this moment where companies are confused about what they actually need to be able to build their own internal applications to build their own revenue workflows, where the most sophisticated AI native companies are leveraging our data throughout that entire workflow and then companies that are doing sort of quick AI projects have not made that realization yet. ***And so we are positioning the company from a pricing and packaging perspective to take advantage of that situation. So that when we talk to a customer who tells us, I don't need seats anymore because I've built my own application that we can be really flexible and say, look, your own application is going to need contact information.*** It's going to need company information. It's going to need hierarchy

COMPLAINT - 24

information. It's going to need signal information, and we can be really flexible on your transition over to that as you build your own internal application.

<Q: Aleksandr J. Zukin – Wolfe Research, LLC – MD & Head of the Software Group> And then maybe to the -- Henry, to the point that you made earlier about some of your motions, particularly kind of unleashing the data asset. It was particularly striking that at the same time as you're calling out kind of some headwinds in broader software and AI anxiety, 2 of your most iconic wins, I think that you cited in the quarter were with Sierra and another AI Unicorn. So maybe can you just help us understand how -- I assume those 2 companies aren't massively expanding seat count. So how are those 2 iconic wins specifically leveraging some of that kind of leading edge functionality that you're talking about? And what do those either expands or lands look like relative to previous cohorts?

<A: Henry Schuck> Yes. *I think the big difference that we're seeing is customers -- those AI native customers are building their own internal revenue workflows. In software, you have a very opinionated interface that you provide your customers. And it's opinionated because you have product managers who deeply understand the domain and they try to build a flexible enough interface or a generic interface that customers across a broad spectrum of types and revenue workflows can get value out of.*

The AI natives are building their own revenue workflows. They're building their own interfaces. They're bringing in their own first-party data. They're building in their own unique workflows. Every company's go-to-market workflow is a little bit different than the next companies. But every company's go-to-market workflow requires data on companies, requires data on contact, requires hierarchy and subsidiary mapping so that you could do territory segmentation and planning. And so these companies are coming in and they're saying, we have a revenue workflow, we've built it. *We've built a prospecting workflow, but we need data to plug into that. And so these deals are much heavier on the data consumption side and much lighter on the seats.*

<Q: Raimo Lenschow – Barclays Bank PLC – MD & Analyst> What you're seeing at the moment in software, is that the software companies are reducing their sales capacity? Or is it that they are actively building the front end like the AI guys are doing?

<A: Henry Schuck> *I think it's a little bit of both. But I think at this point, we are happy to see it spill over into other industries because we think the bigger upside opportunity here is consumption of our data where every go-to-market workflow runs.* And so yes, we see it in software today, and we're leaning in to capture that opportunity with much more flexible pricing and the ability to transfer seat prices into consumption of our data.

COMPLAINT - 25

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

<Q: Raimo Lenschow – Barclays Bank PLC – MD & Analyst> Yes, it makes total sense. I mean you always have a very strong data set from the very beginning since we first met you. And Graham, then if you think about guidance, like how much is that -- is the guidance implying that software is moving versus other guys are moving? Is that -- do you think about this in stages like this year is more software and it's part of the guidance and then next year something else? Or like are you going to -- like this year, the whole model gets flipped to consumption anyway. And so whatever other industries are doing, it doesn't matter then?

<A: Michael Graham O'Brien> Yes. I don't think it's -- I think there's a certainly a vertical-specific assumption around software. But look, we still see good performance in our upmarket business and our operations business. And the revision to revenue and the cost out is focused on our downmarket business where our margin profile is the worst. ***The development of uncertainty on multiple fronts is the primary reason behind the guidance revision, and we want to minimize the risk of another negative revision.***

38.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the aforementioned public statements during earnings and investor conference calls. On those calls, Defendants continually touted the Company's continued revenue growth of its legacy and emerging AI-driven products and sustained improvement in net revenue retention and repeatedly affirmed ZoomInfo's 2026 full year revenue outlook, while minimizing concerns that customers were moving towards consumption-based usage models and developing internal AI-driven go-to-market solutions.

39.     Investors and analysts reacted immediately to ZoomInfo's revelation. The price of ZoomInfo's common stock declined dramatically. From a closing market price of $6.04 per share on May 11, 2026, ZoomInfo's stock price fell to $4.06 per share on May 12, 2026, a decline of about 33%.

40.     A number of well-known analysts who had been following ZoomInfo lowered their price targets in response to ZoomInfo's disclosures. For example, Mizuho Securities dropped their price target 27% commenting, "[w]e are skeptical that there is a clear path to returning to growth over the near-term given the aforementioned challenges and limited visibility."

COMPLAINT - 26

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

41. Similarly, Canaccord Genuity dropped their price target 58% commenting, "[n]ow as sales enablement workflows are being reimagined for the AI era, buyer preferences are evolving. ZoomInfo needs to meet those preferences by introducing greater licensing flexibility and making its data available wherever and however customers want to consume it."

42. Piper Sandler analyst expressed concern and lowered its price target 34% stating, "[g]iven there are multiple headwinds and the transition to usage will take time (and introduces additional execution risk) we are downgrading to Underweight."

Additional Scienter Allegations

43. During the Class Period, Defendants acted with scienter in that they knew, should have known, or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of ZoomInfo were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning the risk that customers were moving towards consumption-based usage models, increasing churn and downsell and weakening enterprise demand leading to revenue declines.

44. Notwithstanding such, Defendants repeatedly and affirmatively represented to investors that ZoomInfo was well positioned to implement and capitalize upon its growth initiatives to reach its full-year 2026 fiscal targets. Defendants further repeatedly claimed growth of its emerging AI-driven products and minimized concerns that customers were delaying purchases due to uncertainty regarding AI strategies and reevaluating whether to develop internal AI-solutions.

45. Defendants' scienter is further evidenced by their repeated claims of confidence that ZoomInfo would sustain its growth trajectory in its core software business and continue to improve net revenue retention and achieve its stated full year 2026 guidance, including assurances that large enterprise adoption was accelerating, despite ultimately disclosing elevated churn and downsell in its software vertical and lowered its full year 2026 revenue guidance.

COMPLAINT - 27

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

Loss Causation and Economic Loss

46.    During the Class Period, as detailed herein, ZoomInfo and the Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of ZoomInfo's securities and operated as a fraud or deceit on Class Period purchasers of ZoomInfo's securities by materially misleading the investing public. Later, when ZoomInfo and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of ZoomInfo's securities materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of ZoomInfo's securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

47.    ZoomInfo's stock price fell in response to the corrective events, as alleged *supra*. On these dates, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning ZoomInfo's legacy and emerging AI-driven products, core software business, net revenue retention and growth outlook.

48.    In particular, after the market closed on May 11, 2026, ZoomInfo announced slowing seat-based demand, weakening upsells and customers revising decisions to purchase AI products and develop internal AI-driven go-to-market solutions and lowered its full-year 2026 financial outlook.

Presumption of Reliance; Fraud-On-The-Market

49.    At all relevant times, the market for ZoomInfo's securities was an efficient market for the following reasons, among others:

(a)    ZoomInfo's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)    ZoomInfo communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of

COMPLAINT - 28

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    ZoomInfo was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about ZoomInfo was reflected in and incorporated into the Company's stock price during the Class Period.

50.    As a result of the foregoing, the market for ZoomInfo's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in ZoomInfo's stock price. Under these circumstances, all purchasers of ZoomInfo's securities during the Class Period suffered similar injury through their purchase of ZoomInfo's securities at artificially inflated prices, and a presumption of reliance applies.

51.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

52.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with materially misleading statements about its financial growth and stability while at the same time omitting then existing material adverse information concerning the Company's

COMPLAINT - 29

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

advertising practices. Defendants provided the public with information about their operations that failed to account for negative realities concerning their undisclosed conduct.

53.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

54.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of ZoomInfo who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ZoomInfo's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

COMPLAINT - 30

56.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ZoomInfo's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ZoomInfo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of April 30, 2026, there were 294.7 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

57.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of ZoomInfo;

COMPLAINT - 31

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

(c)   whether the Individual Defendants caused ZoomInfo to issue false and misleading financial statements during the Class Period;

(d)   whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)   whether the prices of ZoomInfo's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**
*Against All Defendants for Violations of*
*Section 10(b) and Rule 10b-5 Promulgated Thereunder*

61.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.   This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

63.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in

COMPLAINT - 32

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ZoomInfo common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire ZoomInfo's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

64. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for ZoomInfo's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

65. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

66. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of ZoomInfo's internal affairs.

COMPLAINT - 33

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

67. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their position of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to ZoomInfo's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of ZoomInfo's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired ZoomInfo's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

68. During the Class Period, ZoomInfo's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of ZoomInfo's common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of ZoomInfo's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of ZoomInfo's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

COMPLAINT - 34

69.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

70.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II
### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

71.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

72.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior position, they knew the adverse non-public information about ZoomInfo's misstatements.

73.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by ZoomInfo which had become materially false or misleading.

74.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which ZoomInfo disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised his power and authority to cause ZoomInfo to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning

COMPLAINT - 35

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ZoomInfo's securities.

75.    The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions and/or being directors of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, ZoomInfo to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

76.    By reason of the above conduct, the Individual Defendants and/or ZoomInfo are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: June 25, 2026.                                    TOWNSEND LEGAL, PLLC

By: /s Roger M. Townsend
Roger M. Townsend, WSBA# 25525
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Phone: (206) 761-2480

COMPLAINT - 36

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

Fax: (206) 455-9555
roger@townsendlegal.com

-and-

Adam M. Apton* (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Phone: (415) 373-1671
aapton@zlk.com

*Pro Hac Vice Application Forthcoming

Attorney for Plaintiff

COMPLAINT - 37

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480